**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

YULIYA MIRETSKAYA,

    Plaintiff,

      v.

RUTGERS, THE STATE UNIVERSITY OF
NEW JERSEY, *et al.,*

    Defendants.

Civil Action No. 20-14856 (RK) (JTQ)

**<u>OPINION FILED TEMPORARILY
UNDER SEAL</u>**

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon five Motions to Dismiss filed by
Defendants Krystyna Banfield, APN ("Banfield"), (ECF No. 108), Mariam Bekhit, M.D.
("Bekhit"), (ECF No. 138), HMH Hospitals Corporation d/b/a Raritan Bay Medical Center
("RBMC"), Hackensack Meridian Health, Inc. ("HMH"), Arunesh K. Mishra, M.D. ("Mishra"),
Rajkumar R. Singh, M.D. ("Singh"), Emma Locke, LCSW ("Locke"), Maritza Brown, R.N.
("Brown"), and Rosario F. Sencion-Pou, P.C.T. ("Sencion-Pou") (collectively, "RBMC
Defendants"), (ECF No. 171), Carmencita T. Lanez, M.D. ("Lanez"), (ECF No. 172), and Rutgers,
the State University of New Jersey ("Rutgers"), (ECF No. 173).[1] Defendants move to dismiss *pro
se* Plaintiff Yuliya Miretskaya's ("Plaintiff" or "Miretskaya") Amended Complaint, (ECF No. 38),
and Revised Second Amended Complaint, (ECF No. 162). The Court has carefully considered the
parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of

---

[1] The Court will refer to all Defendants collectively as "Defendants."

Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motions to Dismiss are **GRANTED in part** and **DENIED in part as moot**.

## I.   <u>BACKGROUND</u>

At the outset, the Court notes that Plaintiff is proceeding *pro se*, and as such, the Court will construe Plaintiff's pleadings liberally. Plaintiff's numerous pleadings are asserted against sixteen defendants, only some of whom have been served, with multiple constitutional, statutory, and common law claims asserted. In total, Plaintiff has filed a total of four complaints, (*see* ECF Nos. 1, 38, 147, 162), not including a previously stricken complaint, (ECF No. 14). The Court will treat Plaintiff's Revised Second Amended Complaint, ("SAC," ECF No. 162) as the operative pleading, but in light of Plaintiff's *pro se* status, and in an abundance of caution, the Court will construe the SAC in conjunction with Plaintiff's Amended Complaint, ("Am. Compl.," ECF No. 38).[2] *See Cason v. Middlesex Cnty. Prosecutors' Off.*, No. 18-2101, 2022 WL 2871195, at *3 (D.N.J. July 21, 2022) (A *pro se* plaintiff's complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Montgomery v. Pinchak*, 294 F.3d 492, 500 (3d Cir. 2002))).[3]

The underlying facts of this dispute have been thoroughly discussed and set forth in the July 12, 2021 Memorandum Order ("Shipp I," ECF No. 34) and the July 29, 2022 Memorandum Opinion ("Shipp II," ECF No. 118) of the Honorable Michael A. Shipp, U.S.D.J. Judge Shipp's prior Order granted in part and denied in part a previous Motion to Dismiss filed by Rutgers, (*see*

---

[2] Plaintiff's SAC includes only counts one through four, seven, and nine; though, in the SAC, Plaintiff "incorporates and preserves and claims all causes of action . . . in his First Amended Complaint." (SAC ¶ 184.) The Amended Complaint includes nine total claims. (Am. Compl. ¶¶ 110–188.) Plaintiff's Complaints, in the aggregate, total 125 pages and 372 paragraphs, with the numbering of the causes of actions continuing across Complaints and appearing confusing at times.

[3] At times, the Court refers to ECF Nos. 38 and 162 collectively as the "Complaints" when describing the totality of Plaintiff's allegations. The Court will specify when referring to one only one specific Complaint.

*generally* Mem. Order), and granted subsequent Motions to Dismiss filed by Rutgers and Lanez, respectively, (*see generally* Shipp II). As such, the Court recites only those facts necessary to resolve the pending Motions.

### A.   PROCEDURAL HISTORY

On July 22, 2020, Plaintiff filed his original Complaint in the Superior Court of New Jersey, Middlesex County, Law Division. (*See* ECF No. 1.) Shortly thereafter, Rutgers removed this case to federal court, (*id.*), after which Rutgers filed a Motion to Dismiss for Ineffective Service of Process under Federal Rule of Civil Procedure (the "Rules") 12(b)(5) or, in the alternative, for Failure to State a Claim under Rule 12(b)(6), (ECF No. 7). On July 12, 2021, Judge Shipp granted in part and denied in part Rutgers' Motion, dismissing Plaintiff's False Imprisonment claim without prejudice, ordering the Clerk of Court to issue a new summons for Plaintiff to effectuate proper service, and granting Plaintiff leave to file an Amended Complaint. (*See generally*, Mem. Order.) On August 12, 2021, Plaintiff filed an Amended Complaint. (ECF No. 38.) The RBMC Defendants filed an Answer to Plaintiff's Amended Complaint, (ECF Nos. 52, 60), as did Banfield, (ECF No. 57).[4] Lanez and Rutgers filed respective Motions to Dismiss Plaintiff's Amended Complaint. (ECF Nos. 58, 77.)

Once these motions were fully briefed, Judge Shipp granted both Motions. (*See* ECF Nos. 118, 119.) Judge Shipp dismissed Plaintiff's negligent infliction of emotional distress ("NIED") claim against Rutgers with prejudice, finding that Plaintiff failed to file the requisite notice of claim pursuant to the New Jersey Tort Claims Act ("NJTCA"). (Shipp II at 5–6.) Judge Shipp also dismissed the NIED claim against Lanez without prejudice as it was group pled. (*Id.* at 6–7.) With

---

[4] The RBMC Defendant appear to have filed an Amended Answer at ECF No. 60, which includes Defendant Locke and asserts crossclaims for indemnification and contribution against their co-defendants.

respect to Plaintiff's federal and state constitutional claims under 42 U.S.C. § 1983 ("Section 1983") and N.J. Stat. Ann. § 10:6-2, the New Jersey Civil Rights Act ("NJCRA"), Judge Shipp held that because Rutgers could not be vicariously liable for the actions of its employees under Section 1983, and Plaintiff failed to plead "a policy or custom that sufficiently violates constitutional rights," Plaintiff failed to state a claim for constitutional violations against Rutgers. (*Id.* at 8–10.) Judge Shipp also held that Plaintiff failed to state a claim against Lanez for constitutional violations. (*Id.* at 10–11.) Next, Judge Shipp dismissed Plaintiff's claims under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"), finding that neither Rutgers' employees nor Lanez were aware of Plaintiff's disability or discriminated against Plaintiff based on same. (*Id.* at 11–14.) Finally, Judge Shipp dismissed Plaintiff's false imprisonment claim on the basis that Plaintiff failed to "allege that Dr. Lanez acted without proper legal authority or justification" and that Dr. Lanez acted reasonably in relying on the medical opinions of her colleagues. (*Id.* at 13–14.)

Following Judge Shipp's Memorandum Opinion, on December 5, 2022, Plaintiff filed a Second Amended Complaint. (ECF No. 162.) Thereafter, as referenced above, Defendants have filed a number of Motions to Dismiss, and these Motions are now ripe before the Court.[5] After a brief discussion of the factual background of the case at bar, the Court will turn to each of Plaintiff's claims.

## B. FACTUAL BACKGROUND

This matter arises from Plaintiff's twelve day—from July 22, 2018 to August 3, 2018—involuntary confinement at RBMC. (SAC ¶ 1.) Plaintiff, a New Jersey resident, was previously

---

[5] The five pending Motions to Dismiss were filed by Banfield, (ECF No. 108), Bekhit, (ECF No. 138), RBMC Defendants, (ECF No. 171), Lanez, (ECF No. 172), and Rutgers, (ECF No. 173). For each motion, Plaintiff filed a brief in opposition, (*see* ECF Nos. 126, 154, 203, 183, and 215), and the relevant Defendant filed a reply brief, (*see* ECF Nos. 136, 161, 205, 186, and 218).

diagnosed with Asperger's Syndrome and Attention Deficit Disorder ("ADD"). (*Id.* ¶ 8.) On July 22, 2018, Plaintiff called a Suffolk County, New York mental health crisis hotline. (*Id.* ¶¶ 61–62.) During the conversation, Plaintiff's own SAC sets forth that Plaintiff "resort[ed] to parodic speech and [began to] speak in a comedic 'Borat' accent" and expressed a desire "to harass and terrorize a 'third-cousin's sister-in-law.'" (*Id.* ¶¶ 63–64.) Plaintiff, "[w]ith similar sarcasm," discussed "honor killings" and observed that these practices "unreasonably [] exposed families . . . to criminal causes of action, despite [that] such practices comport[ed] with conservative values and [were] 'Biblically encouraged.'" (*Id.* ¶ 66.) The hotline operator told Plaintiff he planned to call the police and thereafter ended the conversation. (*Id.* ¶ 73.) That evening, Woodbridge, New Jersey Police Officers conducted a welfare check and explained that they had received "a report that someone called a suicide hotline and was allegedly 'threatening to kill their sister' and 'was planning to hire a hit-man.'" (Am. Compl. ¶ 39.) The Police detained Plaintiff and took Plaintiff to the Crisis Stabilization Unit ("CSU") at RMBC for a welfare check. (*Id.* ¶¶ 44–45.)

At RMBC, Brown, the "Nurse-On-Duty" that evening, provided Plaintiff with hospital gowns into which Plaintiff was "ordered" to change. (*Id.* ¶ 47.) Plaintiff proceeded to watch TV, until Plaintiff was directed to bed. (*Id.* ¶¶ 50–51.) Following a disagreement concerning Plaintiff's request to continue watching TV, Plaintiff was restrained and medicated. (*Id.* ¶¶ 52–57.) Plaintiff alleges that Brown administered the medication, while Banfield authorized "an Order for use of physical and chemical restraints upon Plaintiff." (*Id.* ¶ 60.) Defendant Sencion-Pou assisted in restraining Plaintiff and drew Plaintiff's blood. (*Id.* ¶¶ 61–62.) While Plaintiff was in the CSU, Locke, a social worker, took a series of clinical notes of Plaintiff, in which she observed Plaintiff

was "agitated" and "unable to redirect." (*Id.* ¶ 67.) Lanez thereafter determined Plaintiff was "likely committable" based on Locke's notes. (*Id.* ¶69; *see also* SAC ¶¶ 104–05.))

Dr. Bekhit, a psychiatrist, also assessed Plaintiff, in which she made the "preliminary diagnosis of 'Disorganized Schizophrenia'" and determined that Plaintiff met the "criteria for involuntary psychiatric treatment." (Am. Compl. ¶¶ 72, 75.) Plaintiff contends that Greg Fitzpatrick ("Fitzpatrick"), as La Shauna Richardson's ("Richardson") supervisor, and Dr. Mishra, as Chief of Psychiatry at RBMC, failed to properly supervise the medical professionals at RBMC which resulted in Plaintiff's involuntary commitment as opposed to an unspecified lesser alternative. (*Id.* ¶¶ 94–95; SAC ¶ 137.)

Following these evaluations of Plaintiff,[6] an independent evaluation was conducted by Richardson, a Mental Health Clinician, licensed clinical social worker, and an employee of Rutgers, on July 23, 2018. (Am. Compl. ¶ 76; *see also* ECF No. 27.)[7] Plaintiff claims he explained to Richardson that he "wished to pursue voluntary treatment." (Am. Compl. ¶ 85.) Richardson, like Dr. Bekhit, determined that Plaintiff met the criteria for involuntary commitment. (*Id.* ¶ 82.)

████████████████████████████████████

████████

   ██████████████████████████████
   ██████████████████████████████
   ██████████████████████████████

---

[6] The Court notes that Plaintiff refers to himself using masculine pronouns in the Complaints. Richardson's evaluation refers to Plaintiff using feminine pronouns. In light of the fact that Plaintiff uses the masculine pronouns, so too will the Court.

[7] The "Acute Services Brief Assessment" of Plaintiff was filed by Rutgers in this action and reflects the events described in Plaintiff's Complaints. *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (a court may also review "exhibits attached to the complaint and matters of public record," as well as "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"). Plaintiff himself repeatedly relies and cites the document at various points throughout the Second Amended Complaint. (*See, e.g.,* SAC ¶¶ 53, 87, 124, 149.)



(ECF No. 27 at *2–3.)



(*Id.* at *3.)

(*Id.*)

(*Id.*)

(*Id.*)



(*Id.* at *6.)[8] ████████████████████████████████████████████████

██████████████████████ (*Id.* at *15.)

On July 25, 2018, Plaintiff was admitted to RBMC's Center for Living. (Am. Compl. ¶ 96.) On July 27, 2018, an *ex parte* petition for involuntary commitment was submitted to and approved by a Middlesex County Superior Court judge. (*Id.* ¶ 87.) Dr. Singh was the Attending Psychiatrist during Plaintiff's stay in the Center for Living, but Plaintiff alleges Dr. Singh "failed to provide the appropriate standard of care" by relying on Dr. Bekhit's assessment, thus prolonging Plaintiff's commitment. (*Id.* ¶ 97.) On August 3, 2018, Plaintiff was deemed "stable" and discharged. (*Id.* ¶ 108.)

Plaintiff's Revised Second Amended Complaint, in conjunction with the Amended Complaint, asserts nine causes of action against sixteen Defendants—three entities: Rutgers, HMH, and RBMC, and thirteen individuals—asserting constitutional, statutory, and common law causes of action: a Section 1983 claim for violation of both the substantive and procedural Due Process Clauses of the Fourteenth Amendment (Count One); violations of Title II of the ADA and Section 504 of the RA (Counts Two and Three); violation of the NJCRA (Count Four); Simple

---

[8] It is not clear to the Court the date of this additional social worker's comments. The page with said comments contains two dates—███████████ and ,███████████—the latter of which indisputability was the date that ███████████████████████████████████████████████████. The Court believes the reference to ████ may be a typographical error, or quite a coincidence. Regardless, as Richardson relied on these notes in making her recommendation, the import of the social worker's notes remains that ███████████████████████████████████████████████.

Assault (Count Five); Battery (Count Six); False Imprisonment (Count Seven); Intentional Inflicting of Emotional Distress ("IIED") (Count Eight); and NIED (Count Nine).

### C.   STATUTORY BACKGROUND

Before turning to the Court's analysis, the Court believes it helpful to provide a brief overview of the relevant statute that provides the backdrop of this lawsuit. Pursuant to N.J. Stat. Ann. 30:4-27.1 *et seq.* (the "Act"), the New Jersey legislature "provide[d] a mechanism for the short-term civil commitment of individuals deemed to be harmful to themselves, others, or property." *Ianni v. Bergen Reg'l Med. Ctr.*, No. A-5911-09T3, 2011 WL 2410120, at *2 (N.J. Super. Ct. App. Div. May 11, 2011). The purpose of the Act is "to encourage each county or designated mental health service area to develop a screening service, outpatient treatment provider and short-term care facility which will meet the needs for evaluation and treatment of mentally ill persons in the county or service area." N.J. Stat. Ann. § 30:4-27.1. To those ends, the Act outlines the statutory requirements for involuntary commitment. *Id.*

The Act requires that each county "designate one or more mental health agencies or facilities . . . as a screening service." § 30:4-27.4(a). The "screening service" serves as the emergent treatment center for an individual undergoing a mental health assessment, where medical professionals assess said individual to determine the appropriate care and the "least restrictive environment" for same. § 30:4-27.5(a). A mental health screener, "shall determine, in consultation with the psychiatrist or another physician, as appropriate, the least restrictive environment for the appropriate treatment to which the person shall be assigned or admitted, taking into account the person's prior history of hospitalization and treatment and the person's current mental health condition." § 30:4-27.5(b).  The mental health screener only must determine "if there is reasonable cause to believe that a person is in need of unvoluntary commitment[.]" N.J. Stat. Ann. § 30:4-

27.5(e). An individual may be "admitted involuntarily to a facility only by referral from a screening service or temporary court order." N.J. Stat. Ann. § 30:4-27.9(b). Within 72 hours, the mental health agency or facility must obtain a temporary court order to keep an individual involuntary committed. N.J. Stat. Ann. § 30:4-27.10(a)–(c). If a court orders a temporary order of commitment, the individual must receive a subsequent hearing within 20 days. N.J. Stat. Ann. § 30:4-27.12(a). The decision to involuntary commit an individual under the Act is discretionary. *See Ziemba v. Riverview Med. Ctr.*, 645 A.2d 1276, 1280 (N.J. Super. Ct. App. Div. 1994). The Act provides for civil and criminal immunity for police and medical professionals who "act[] in good faith" to assess and detain an individual for mental health treatment. N.J. Stat. Ann. § 30:4-27.7.

## II.    **LEGAL STANDARD**

### A.    MOTION TO DISMISS UNDER RULE 12(B)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under this rule, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citations omitted). However, the Court "need not credit bald assertions or legal conclusions" or allegations "involv[ing] fantastic factual scenarios lacking any arguable factual or legal basis" or that "surpass all credulity." *Degrazia v. F.B.I.*, No. 08-1009, 2008 WL 2456489, at *3 (D.N.J. June 13, 2008), *aff'd*, 316 F. App'x 172 (3d Cir. 2009) (citations and quotation marks omitted).

A court must only consider "the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Furthermore, "[a] pleading that offers labels and conclusions or a formulistic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted). In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). "Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth." *Valentine v. Unifund CCR, Inc.*, No. 20-5024, 2021 WL 912854, at *1 (D.N.J. Mar. 10, 2021) (citing *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011)).

A *pro se* plaintiff's complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Cason v. Middlesex Cnty. Prosecutors' Off.*, No. 18-2101, 2022 WL 2871195, at *3 (D.N.J. July 21, 2022) (quoting *Montgomery v. Pinchak*, 294 F.3d 492, 500 (3d Cir. 2002)). Notwithstanding the liberal interpretation, the complaint "may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff to relief." *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 282 (D.N.J. 2013).

## III.    DISCUSSION

Defendants move to dismiss Plaintiff's Complaints in their entirety. The Court addresses each of Plaintiff's claims in turn.

## A. COUNTS ONE AND FOUR

In Counts One and Four, Plaintiff asserts causes of actions under Section 1983 and the NJCRA. Plaintiff argues that Defendants violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the New Jersey Constitution. Plaintiff asserts these causes of action against all Defendants.

To establish a claim under Section 1983, a plaintiff "must show that the defendants 1) were state actors who 2) violated his rights under the Constitution or federal law." *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 169–70 (3d Cir. 2004). As the Third Circuit has explained, "[t]he color of state law element is a threshold issue; there is no liability under § 1983 for those not acting under color of law." *Bates v. Paul Kimball Hosp.*, 346 F. App'x 883, 887 (3d Cir. 2009) (quoting *Groman v. Twp. of Manalapan,* 47 F.3d 628, 638 (3d Cir. 1995)). The Court first turns to Plaintiff's claim against Rutgers before turning to the claims against the remaining Defendants.[9]

1. Rutgers

Plaintiff contends that Rutgers is responsible for the actions of its employees, Fitzpatrick and Richardson, and thus liable under Section 1983 for their alleged constitutional violations. (SAC ¶¶ 110; 123–28.) However, "[u]nder § 1983, a government entity, such as Rutgers, cannot be held liable for the actions of its employees on a theory of respondeat superior." *Harel v. Rutgers, State Univ.*, 5 F. Supp. 2d 246, 267 (D.N.J. 1998), *aff'd sub nom.*, 191 F.3d 444 (3d Cir. 1999) (citing *Monell v. Department of Social Serv.*, 436 U.S. 658, 691 (1978)); *see also Hahn v. New Jersey*, No. 11-1874, 2012 WL 870335, at *7 (D.N.J. Mar. 12, 2012) ("[C]ourts do not recognize § 1983 liability on a theory of *respondeat superior*; rather, a plaintiff is required to allege that the defendant, through defendant's own actions, violated the Constitution."). As Judge Shipp found

---

[9] Rutgers does not dispute it is a state actor.

previously, Plaintiff's Amended Complaint "relie[d] solely on vicarious liability and the doctrine of respondeat superior" and thus failed to assert a Section 1983 claim against Rutgers. (Shipp II at 9.)

To assert a constitutional claim against Rutgers as an employer, a plaintiff must instead prove "the existence of a policy or custom that has resulted in a constitutional violation." *Groman*, 47 F.3d at 637 (citing *Monell*, 436 U.S. at 691); *see also Winberry Realty P'ship v. Borough of Rutherford*, 253 A.3d 636, 650 (N.J. 2021) ("Under the [NJ]CRA and § 1983, a municipality can be held liable only if it causes harm through the implementation of official municipal policy." (quotation marks omitted)). "A government policy or custom can be established in two ways: (1) a decision-maker with final authority to set a policy with respect to the action exercises such authority; or (2) certain practices are so well-settled as to 'virtually constitute law' even if there is no official policy." *Sharp v. Kean Univ.*, No. 14-423, 2014 WL 6908775, at *4 (D.N.J. Dec. 8, 2014) (citing *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).

Plaintiff's Revised Second Amended Complaint fails to allege facts that demonstrate the existence of a policy or custom that resulted in constitutional violations.[10] Plaintiff alleges that Rutgers "is the sole entity responsible for providing continuing education, certification, and re-certification for all certified screeners" and "carries ultimate responsibility for all programs conducted under its auspices." (SAC ¶¶ 135–36.) Plaintiff further argues that "Rutgers had full responsibility for ensuring that certified screeners were competent, were not committing egregious misapplications of involuntary commitment, and did not violate the law while executing their duties." (*Id.* ¶ 136.) Plaintiff argues that Rutgers operates "in a joint project with NAMI Central

---

[10] As discussed above, because Plaintiff may not proceed on a theory of *respondeat superior* for either a Section 1983 or NJCRA claim, the Court need not address Plaintiff's allegations concerning Rutgers' employees.

Middlesex [National Alliance on Mental Illness]" which Plaintiff alleges "has a toxic culture, where hard paternalism and a general disregard for civil rights guide its operation and polices." (*Id.* ¶ 139.)[11] As such, "Rutgers worked directly with an organization whose activities may be plainly construed as promoting civil rights violations and abuses." (*Id.* ¶ 142.)

While it may be true that Rutgers has a policy on how to train certified screeners and how to implement New Jersey's civil commitment law, Plaintiff alleges no facts as to how this policy caused alleged constitutional violations. Plaintiff does not contend that the New Jersey Act is unconstitutional.[12] While Plaintiff asserts that NAMI has a "toxic culture" that has somehow, without specification, seeped into Rutgers' training and civil commitment detention procedures, Plaintiff's conclusory allegations that this culture results in constitutional violations are insufficient to state a claim under Section 1983.[13] *See Green v. Domestic Rels. Section Ct. of Common Pleas Compliance Unit Montgomery Cnty.*, 649 F. App'x 178, 180 (3d Cir. 2016) ("Conclusory allegations are insufficient to survive a motion to dismiss." (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009))); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405 (3d Cir. 1997) (explaining that the Court need not credit "unsupported conclusions and unwarranted inferences").

---

[11] Plaintiff does not elaborate by what he means by "hard paternalism," and thus the Court is unclear of its meaning.

[12] Moreover, the Third Circuit has held that "in an emergency situation, a short-term commitment without a hearing does not violate procedural due process." *Benn*, 371 F.3d at 174.

[13] Plaintiff appears to latch onto Judge Shipp's statement that "[t]he closest Miretskaya comes to alleging a custom or policy is the use of 'Rutgers' IFSS [Intensive Family Support Services] program." (Shipp II at 10.) Plaintiff's Second Amended Complaint alleges that IFSS had, in part, a culture in which "civil rights protections were just pesky impediments that ought to be disregarded." (SAC ¶¶ 138–42.) However, despite Plaintiff's disagreements with IFSS, Plaintiff again fails to "allege that the system catalyzed or sanctioned any constitutional violation." (Shipp II at 10.) As Judge Shipp found in his prior decision, this Court similarly finds that Plaintiff's allegations "do not establish that the Rutgers training program was the impetus for the [alleged] constitutional violation." (*Id.* at 10 n.5.)

2. <u>Remaining Private Defendants</u>

Plaintiff also asserts Section 1983 and NJCRA claims against the remaining Defendants—HMH, RBMC, Lanez, Bekhit, Locke, Brown, Sencion-Pou, Mishra, and Singh.[14] As referenced above, the threshold issue in a Section 1983 action is whether Defendants were state actors. *See Benn*, 371 F.3d at 169–70. Plaintiff concedes that RBMC and HMH are private entities, and thus the two medical centers and its employees are not public persons; however, Plaintiff nonetheless contends that Defendants "were acting under color of State law," (Am. Compl. ¶ 111), and "must be construed to be [] state actor[s]," (SAC ¶ 112). Plaintiff argues that New Jersey's civil commitment law, N.J. St. Ann. 30:4-27.1 *et seq.* establishes the statutory scheme through which Defendants operated, thus their actions constituted state action. (*See* SAC ¶¶ 88–107.)

     *i.*     *State Action*

The Supreme Court has explained that whether a private party is a state actor "is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). In *Brentwood*, the Supreme Court "identified a host of facts" that can bear on this determination:

> We have, for example, held that a challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents . . . . We have treated a nominally private entity as a state actor when it is controlled by an agency of the State, when it has been delegated a public function by the State . . . when it is entwined with governmental policies, or when government is entwined in [its] management or control . . . .

*Id.* at 296 (internal quotation marks and citations omitted).

---

[14] The Court refers to "Defendants" in § III.A.2 as all Defendants except Rutgers.

In *Benn*, the Third Circuit analyzed each of these factors to determine whether a private Pennsylvania healthcare clinic, its parent corporation, and its employees—a doctor and a counselor—could be considered state actors. *Benn*, 371 F.3d at 171. The plaintiff brought suit following his short-term involuntary commitment pursuant to Pennsylvania's Mental Health Procedures Act ("MHPA"). *Id.* at 168. The Third Circuit held that the actions of the private individuals and facility could not be deemed state action despite the medical professionals acting in accordance with the MHPA. *Id.* at 171. First, the Third Circuit held that "the MHPA . . . did not coerce [the defendant appellees] to file the application that led to [the plaintiff appellant's] commitment," nor did it "provide significant encouragement, either overt or covert." *Id.* (citations and internal quotation marks omitted). Because the MHPA "permits a physician . . . to file an application for an emergency examination," the Third Circuit explained that "nothing in the MPHA [] compels or even significantly encourages the filing of an application." *Id.*

Next, the Third Circuit held that the defendants were not "willful participant[s] in joint activity with the State or its agents." *Id.* (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)). In *Lugar*, the Supreme Court found state action where "a private party's joint participation with state officials . . . is sufficient to characterize that party as a 'state actor' . . . ." *Lugar*, U.S. at 941. However, "private misuse of a state statute does not describe conduct that can be attributed to the State." *Id.* The Third Circuit, in applying *Lugar*, held that the appellant's complaint—that appellees "violated his constitutional rights because they allegedly did not comply with the MHPA"— was insufficient to demonstrate that the appellees were state actors. *Benn*, 371 F.3d at 172. As the Third Circuit explained, even a "seriously defective evaluative process [under the MHPA]" was "inadequate to establish state action." *Id.* The Third Circuit also found that involuntary commitment was "not a 'public function' that the MPHA delegated to private

persons." *Id.* The Circuit found "no basis for concluding that petitioning for involuntary confinement is or ever was the exclusive prerogative of the state, either in Pennsylvania or in the country in general." *Id.* (collecting cases).

The Third Circuit next considered whether there was "entwinement" under the Supreme Court's decision in *Brentwood*. *Id.* at 172–73. In *Brentwood*, the Supreme Court considered whether a non-profit interscholastic athletic association of public and private secondary schools was a state actor in enforcing its regulations. *Brentwood*, 531 U.S. at 290. The Supreme Court answered the question in the affirmative, finding that "[t]he nominally private character of the [a]ssociation is overborne by the pervasive entwinement of public institutions and public officials in its compositions and workings . . . ." *Id.* at 298. The Court focused on the facts that, *inter alia*, the majority of the association, 84%, was comprised of public schools, state board members served as "ex officio" members of the association's board, many of the board's meetings occurred during school hours, association employees were members of the state retirement system, and public schools provided the vast majority of the association's financial support. *Id.* at 298–300. Thus, the Supreme Court held that "the [a]ssociation is an organization of public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling," and this "[e]ntwinement" substantiated a finding of state action. *Id.* at 300–01. On the other hand, the Third Circuit, in *Benn*, found similar factors lacking such that there was no entwinement to support a finding that the private doctors and entity were state actors. *Benn*, 371 F.3d at 173.

Further, the Third Circuit considered whether there was a "symbiotic relationship" between the state and a private entity such that there could be considered state action. *Id.* The Third Circuit explained that this test requires "'a close association of mutual benefit' between the state and the

private entity or person." *Id.* (quoting *Crissman v. Dover Downs Entertainment, Inc.*, 289 F.3d 231, 240 (3d Cir. 2002). No such relationship existed in *Benn* where the private defendants did not profit financially from the plaintiff's involuntary commitment, nor did the state incur "any tangible benefit . . . save from a possible increase in the general welfare." *Id.* In summary, the Third Circuit counseled "[t]hat a private entity performs a function which serves the public does not make its acts state action." *Id.* (quoting *Rendell–Baker v. Kohn*, 457 U.S. 830, 842 (1982).

Finally, the third Circuit surveyed "decisions of other courts of appeals and those of district courts in this circuit," observing that they "also support the conclusion that persons who petition for the involuntary commitment of others are not state actors." *Id.* (collecting cases).

In the case at bar, Plaintiff's Complaints allege that Defendants were state actors. (*See, e.g.*, SAC ¶¶ 111–12; Am. Compl. ¶¶ 111.) Plaintiff contends that Defendants were acting pursuant to the regulatory scheme required by the Act. Thus, according to Plaintiff, "the existence of [] position[]s and duties [performed by Defendants] were explicitly required and stipulated by law" and constituted state action. (*See SAC ¶* 114.)

Plaintiff, however, misinterprets the provisions of the state law which do not require a medical professional to involuntary commit someone they suspect in need of assistance. Rather, it outlines a procedure to follow and authorizes discretion in deciding whether to commit an individual. *See Ziemba*, 645 A.2d at 1280. As such, similar to the MHPA in *Benn*, while the two state laws "permit" medical professionals to petition a court for an order involuntary committing an individual, neither "compels or even significantly encourages the filing of an application," and thus the discretionary decision to commit an individual did not constitute state action. *Benn*, 371 F.3d at 171.

Moreover, the "private misuse of a statute does not describe conduct that can be attributed to the State." *Id.* (quoting *Lugar*, 457 U.S. at 940). The Supreme Court explained that "state action requires *both* an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (emphasis in original) (quoting *Lugar*, 457 U.S. 937). Without this second requirement, "private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Lugar*, 457 U.S. at 937. Moreover, "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Sullivan*, 526 U.S. at 52 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 (1974)).[15] As such, the fact that Defendants were acting pursuant to a state law does not render their action state conduct.

In addition, Plaintiff fails to allege any facts in the Complaints that "nominally private persons were controlled by an agency of the Commonwealth" or that the challenged action "relates to a function that has been traditionally the exclusive prerogative of the State." *Benn*, 371 F.3d at 172 (citations and internal quotation marks omitted). Nor does Plaintiff allege any facts demonstrating a "symbiotic relationship" between the private Defendants and New Jersey in which there is a "mutual benefit." *Id.* at 173. As the Third Circuit explained in *Benn*, there was no "symbiotic relationship" where the plaintiff fails to show the private defendants profited from the decision to commit the plaintiff. *Id.* Such allegations are similarly lacking in the case at bar.

---

[15] The same analysis applies to the state actor requirement under Section 1983 and the Fourteenth Amendment. *See Lugar*, 457 U.S. at 929. ("[I]t is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical.").

Plaintiff also argues that "RBMC and Rutgers . . . were mutually *entwined* and in a *symbiotic relationship*, and were clearly performing a public function." (SAC ¶ 114 (emphasis in original).) Aside from such conclusory allegations which fail to state a claim, *Iqbal*, 556 U.S. at 679, Plaintiff fails to demonstrate that the case at bar involves "entwinement" under the Supreme Court's decision in *Brentwood*. Plaintiff's allegations merely contend that the Act creates a procedure that Defendants followed. Plaintiff fails to show that the "nominally private character" of RBMC is "overborn by the pervasive entwinement" with either Rutgers or the state of New Jersey such that RBMC or its employees may be deemed state actors. *Brentwood*, 531 U.S. at 298. Plaintiff's Complaints are devoid of allegations that state professionals control the private facility or state medical professionals, or that a large portion of the facility's funding or employee's salary come from the state. *Id.* Plaintiff does not contend that RBMC's employees are paid salaries from the state. Plaintiff makes no allegations that seemingly neutral medical personnel have any financial incentive from the discretionary determination of an involuntary commitment. RMBC and its parent company HMH are private, rather not state-owned facility. Even if the facility receives some state funding for its participation in the Act, this does not transform a private entity into a state actor. *See Leshko v. Servis*, 423 F.3d 337, 341 (3d Cir. 2005) ("detailed regulation and receipt of state funds, without more, do not create state action" (citing *Crissman*, 289 F.3d at 244)). As such, *Brentwood* does not mandate a finding of state action.[16]

---

[16] The Court recognizes one court in this district has held otherwise. That case held that a private doctor's "role in certifying individuals for involuntary commitment and treating them at a short-term facility, although private, is deeply entwined with a highly coordinated effort by the State of New Jersey to screen, evaluate, and treat mentally ill individuals who may be dangerous to themselves or others" and thus found state action under *Brentwood*. *Obado v. Univesity of Med. & Dentistry of New Jersey-Behav. Healthcare*, No. 09-1344, 2012 WL 12903880, at *6 (D.N.J. May 21, 2012). The district court in that case focused on the record evidence that established that the plaintiff was initially screened by state employees at a public hospital before being transferred to a private short-term care facility, and the private short-term facility was funded by the state. *Id.* The Third Circuit affirmed on other grounds and explicitly declined to rule on the district court's finding of state action. *See Obado v. UMDNJ, Behav. Health Ctr.*, 524 F. App'x 812, 817

Finally, this decision comports with findings by other courts in this Circuit which have similarly declined to find state action on the part of private hospitals deciding to involuntarily commit an individual under New Jersey law or treating an individual. *See Bates*, 346 F. App'x at 887 (holding that complaint failed to allege private medical facilities were acting under state law with respect to plaintiff's involuntary commitment); *Hahn*, 2012 WL 870335, at *7 (private medical facility not a state actor); *D.V. v. Miller*, No. 08-552, 2008 WL 4816484, at *4 (W.D. Pa. Nov. 4, 2008) (private employees who hold state licenses not state actor); *Layser v. Morrison*, 935 F. Supp. 562, 566 (E.D. Pa. 1995) ("Private physicians unaffiliated with a state institution are not state actors.").

        ii.    *Due Process*

Even assuming *arguendo* that Defendants were state actors, Plaintiff's Section 1983 claims nonetheless fail to state a claim for procedural or substantive due process. The Due Process Clause of the Fourteenth Amendment declares that no state shall "deprive any person of life, liberty, or property, without due process of law.'" U.S. Const. amend XIV. There are both substantive and procedural components of the Fourteenth Amendment. *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000). "To state a claim for deprivation of procedural due process, a plaintiff must demonstrate that (1) he was deprived of an individual interest included within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Toussaint v. Szeto*, No. 22-2446, 2022 WL 1541545, at *2 (D.N.J. May 13, 2022) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006)).

---

n.7 (3d Cir. 2013). In contrast, in the case at bar, Plaintiff never was placed at a state facility, but was merely examined by one Rutgers employee. Moreover, while Plaintiff alleges RBMC receives state funding, as discussed above, such funding does not compel a finding of state action. The factors identified in the Supreme Court's decision in *Brentwood* and Third Circuit's decision in *Benn* govern this Court's analysis.

Plaintiff's Complaints contend that Defendants violated New Jersey's involuntary civil commitment statute. For example, Plaintiff contends that Defendants failed to "satisfy the requirements for 'dangerousness'" under the statute, (Am. Compl. ¶ 115), and failed to provide Plaintiff "with appropriate treatment in the least restrictive setting," (SAC ¶ 129). According to Plaintiff, failure to "adhere to the statutory requirements governing the initiation of involuntary commitment proceedings must be construed as an action in law that violates an individual's substantive and procedural due process rights, thus giving rise to claims under 42 U.S.C. § 1983." (*Id.* ¶ 125.) However, "Section 1983 does not provide a cause of action for violations of state statutes." *Benn*, 371 F.3d at 174 (quoting *Brown v. Grabowski*, 922 F.2d 1097, 1113 (3d Cir. 1990)); *Hahn*, 2012 WL 870335, at *7 (same). As such, Plaintiff's claims for violations of the Act cannot serve a basis for his Section 1983 claims.

Moreover, as referenced above, in emergency situations, short-term commitments do not violate procedural due process. *Benn*, 371 F.3d at 174. Plaintiff admits in the Complaints that Plaintiff "sarcastically" called the Suffolk County mental health crisis hotline and discussed terrorizing another family member, using an assumed feigned dialect. (Am. Compl. ¶¶ 27–33.) The police who conducted the welfare check and visited Plaintiff's home were concerned Plaintiff wanted to hire a "hitman" to murder a family member. (*Id.* ¶ 39.) Moreover, Plaintiff was evaluated by both a social worker and medical doctor who both determined that Plaintiff met the criteria for involuntary commitment. (*Id.* ¶¶ 69–82.) A judge of the New Jersey Superior Court approved Defendants' petition for involuntary confinement, and Plaintiff was stabilized and released well before a second hearing was required. (*Id.* ¶¶ 87, 108.) As such, Plaintiff has failed to allege under these circumstances that Plaintiff's procedural due process rights were violated. *See Benn*, 371 F.3d at 174; *Matter of Commitment of Raymond S.*, 623 A.2d 249, 251 (N.J. Super. Ct. App. Div.

1993) (citing the Act and noting that the "Legislature and the New Jersey Supreme Court have promulgated statutes and rules to ensure that no person is involuntarily committed to a psychiatric institution without having been afforded procedural and substantive due process," such as the requirements of "clear and convincing evidence that the individual has a mental illness, and the mental illness causes the patient to be dangerous to self, to others, or to property"). ███████████ ████████████████████████████████████████████████ (*See* ECF No. 27.)

Plaintiff also fails to allege a violation of substantive due process. As the Third Circuit has explained:

> [T]he appropriate test for assessing liability in the context of involuntary commitment decisions is the "shocks the conscience" standard announced in *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). *Benn,* 371 F.3d at 174. Writing for our Court, then-Judge Alito observed that "[w]hether an incident 'shocks the conscience' is a matter of law for the courts to decide." *Benn,* 371 F.3d at 174. Applying this standard in *Benn,* we found that medical decisions to commit the plaintiff, which the plaintiff characterized as reflecting " 'total incompetenc[e],' " were nonetheless not conscience-shocking given the totality of the circumstances presented. *Id.* at 175.

*Obado v. UMDNJ, Behav. Health Ctr.*, 524 F. App'x 812, 815 (3d Cir. 2013). Plaintiff fails to allege facts that demonstrate Defendants' conduct "shocks the conscience." As discussed above, Plaintiff concedes that Plaintiff's own call to the mental health hotline spurred a welfare check, which led to Plaintiff's involuntary commitment. Plaintiff admits that multiple professionals evaluated him and recommended his commitment. Even accepting Plaintiff's allegations that Defendants' opinions regarding Plaintiff were misguided, or failed to recognize Plaintiff's claimed sarcasm, or the supposed cleverness of his now self-servingly described "prank," this conduct fails to allege a substantive due process violation. *See Benn*, 371 F.3d at 175 (holding that "the doctors' conduct was not conscience-shocking" in light "of the events that led to [the plaintiff's

commitment and the steps taken after his arrival" even if the doctors failed to "properly analyze[]" the plaintiff's condition); *Obado*, 524 F. App'x at 814–16 (despite plaintiff's disagreement with doctor's choice, "decision to recommend [the plaintiff] for involuntary civil commitment does not shock the conscience" where mental health screener and doctor had recommended plaintiff "posed a danger to himself and others"); *see also Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000) ("Mere negligence is never sufficient for substantive due process liability." (citing *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986))).

Nor does the fact that Defendants forcibly medicated Plaintiff, (Am. Compl. ¶¶ 52–57), result in a substantive due process violation. The Third Circuit has "held that authorities may administer antipsychotic drugs over a patient's objection 'where the decision is a product of the authorities' professional judgment.'" *Benn*, 371 F.3d at 175 (quoting *White v. Napoleon*, 897 F.2d 103, 112 (3d Cir.1990); *see also Rennie v. Klein*, 720 F.2d 266, 269 (3d Cir.1983); *Obado*, 524 F. App'x at 816–17 (same). Accordingly, the Court finds that Plaintiff failed to allege a substantive due process violation.[17]

Because Plaintiff has not properly pled violations of Section 1983, Plaintiff's claims under the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2, fail for the same reasons. *See Hottenstein v. City of Seal Isle City*, 793 F. Supp. 2d 688, 695 (D.N.J. 2011) (dismissing New Jersey Civil Rights Act claims "for the same reason the § 1983 claims fail"); *Chapman v. New Jersey*, No. 08–

---

[17] Moreover, Plaintiff contends that Plaintiff "requested voluntary treatment numerous times" such that Plaintiff should not have been involuntarily committed. (*See* SAC ¶¶ 3, 119.) However, this does not alter the Court's opinion. A mental health screener need only discern "reasonable cause to believe that a person is in need of involuntary commitment[.]" N.J. Stat. Ann. § 30:4-27.5(e). Moreover, under the Act, the decision of what constitutes the least restrictive environment is up to the discretion of the medical professionals based on their assessment of the individual, rather than the individual's own belief. N.J. Stat. Ann. § 30:4-27.5(a). As such, even if Plaintiff disagrees with the professional judgment of Defendants who recommended Plaintiff's involuntary commitment, such does not give rise to a substantive due process violation. *Benn*, 371 F.3d at 174–75.

4130, 2009 WL 2634888, *3 (D.N.J. August 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart."); *Desilets on Behalf of Desilets v. Clearview Reg'l Bd. of Educ.*, 627 A.2d 667, 673 (N.J. Super. Ct. App. Div. 1993) ("We are not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart."). Accordingly, Plaintiff's NJCRA claims are also dismissed. For the above reasons, Counts One and Four are dismissed.

### B.  COUNTS TWO AND THREE

In Counts Two and Three, Plaintiff alleges violations of Title II of the ADA and Section 504 of the RA against Defendants Rutgers, Fitzpatrick, Richardson, Lanez, RBMC, HMH, and Singh. (*See* SAC ¶¶ 145–160; Am. Compl. ¶¶ 128–37.) Save for a few exceptions, courts "treat claims under [the ADA and RA] identically." *K.N. v. Gloucester City Bd. of Educ.*, 379 F. Supp. 3d 334, 354–55 (D.N.J. 2019) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). Accordingly, the analysis applies to both claims. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

In order to state a *prima facie* case under either statute, "a plaintiff must show that he is a qualified individual with a disability; that he was excluded from a service, program, or activity of a public entity; and that he was excluded because of his disability." *Disability Rts. New Jersey,*

*Inc. v. Comm'r, New Jersey Dep't of Hum. Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) (citations and internal quotation marks omitted); *see also Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir. 2007) ("To succeed on a claim under Title II, Bowers must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."). "To satisfy the fourth prong, a plaintiff must establish a causal connection between his or her disability and the alleged discrimination." *Heine v. Comm'r of The Dep't of Cmty. Affs.*, No. 11-5347, 2016 WL 7042069, at *9 (D.N.J. Dec. 1, 2016), *aff'd sub nom.*, 794 F. App'x 236 (3d Cir. 2020) (citations and internal quotation marks omitted).

The Court turns to the fourth prong of the analysis. Plaintiff contends that Defendant Richardson wrote that Plaintiff had "paranoid delusions of the police being dangerous and out to get [Plaintiff]," as well as "ruminating thoughts of injustice of involuntary hospitalization." (SAC ¶ 149.) In Plaintiff's subjective view, Richardson "interpreted otherwise reasonable statements and commonly-held beliefs [regarding police violence and involuntary commitment] through the lens of psychiatric pathology" and as such, "any statements emanating from the mouth from someone deemed to be 'crazy'—however reasonable—were invariably symptoms of some underlying lunacy or other mental derangement." (*Id.* ¶ 151.) Further, Plaintiff contends that "Richardson's interpretation of Plaintiff's opinions and beliefs being evidence of mental 'ruminations' and 'paranoia,'" as well as, inter alia, her "pronounced tendency to interrupt him— and her general lack of interest in listening to him" must necessarily result from Richardson's discrimination based on Plaintiff's disability. Plaintiff argues that Richardson's "perceptions and interpretations" can only be construed "as arising from [] stereotypical and prejudicial view[s] of

the 'mentally ill.'" (*Id.*) In toto, Plaintiff alleges that Richardson's actions "appear to be clearly driven by either some prejudice or stereotypes." (*Id.* ¶ 153.) With respect to Fitzpatrick, Plaintiff avers that as Richardson's supervisor, he had responsibility for his superior's actions under a theory of *respondeat superior*. (*Id.* ¶ 155.) As Richardson's employer, Plaintiff argues that Rutgers had responsibility for ensuring their employees did not violate the ADA and RA. (*Id.* ¶ 156.)

Plaintiff is correct that Rutgers "can be vicariously liable for its employee's ADA and RA violations." *Ali v. City of Newark*, No. 15-8374, 2018 WL 2175770, at *5 (D.N.J. May 11, 2018) (citations omitted).[18] And Plaintiff also correctly notes that an ADA claim can rise from a plaintiff's involuntary commitment "based on a stereotyped view of the mentally ill." *Obado*, 2012 WL 12903880, at *9 (quoting *Bolmer v. Oliveira*, 594 F.3d 134, 149 (2d Cir. 2010)). However, Plaintiff's allegations against Richardson, and thus Fitzpatrick or Rutgers, fail to demonstrate that these parties discriminated against Plaintiff due to a disability as yet again Plaintiff fails to cure the defects identified by Judge Shipp in his July 29, 2022 Memorandum Opinion. The Second Amended Complaint again "fails to allege 'discriminatory animus on the part of [Rutgers] or [Richardson or Fitzpatrick]' or "point[] to [any] discriminatory policies, contemporaneous statements, or any circumstantial evidence suggesting [Rutgers] or [Richardson or Fitzpatrick] acted under the assumption that all individuals with mental illness . . . require involuntary commitment.'" (Shipp II at 14 (quoting *Obado*, 524 F. App'x at 817).)

Plaintiff only sets forth conclusory allegations regarding Richardson's supposed discriminatory animus or views of the disabled, but fails to allege any facts regarding same. Plaintiff's Second Amended Complaint is devoid of any facts which allege or infer that Richardson

---

[18] The Court need not decide whether a supervisor, under these alleged facts and circumstances, can be liable under a theory of vicarious liability at this time.

took any actions based on Plaintiff's disability, as opposed to, as Plaintiff admits, Plaintiff's own unprompted phone call and threats to the Suffolk County mental health line and then to police. *See Heine*, 2016 WL 7042069, at *10 (dismissing complaint because "[i]t fails to allege that [plaintiffs] have suffered discrimination on the basis of disability. It fails to allege the required causal connection."). Plaintiff's own allegations confirm and bespeak surmise and conjecture—not fact. Plaintiff seeks the Court to impute discrimination based on allegations that "*appear to be* clearly driven by either some prejudice or stereotypes," (SAC ¶ 153 (emphasis added)), "*may be* plainly construed as promoting civil rights violations and abuses," (*id.* ¶ 142 (emphasis added)), that are not "*beyond the pale of possibility*," (Am. Compl. ¶ 130 (emphasis added)), or that misinterpreted "Plaintiff's unique manner of communication, and his *obvious* proclivity to resorting to sarcasm or provocative manner of speech," (*id.* ¶ 132 (emphasis added)). Such conjecture is not tantamount to evidence establishing the required causal connection.

Plaintiff also contends that other Defendants' actions resulted from differential treatment because of Plaintiff's disability. With respect to Lanez, Plaintiff contends that "it can be inferred" that her actions resulted from an unlawful view that those with mental illness required involuntary commitment. (SAC ¶ 159.) Plaintiff contends that Defendant Bekhit's notes discuss Plaintiff's "prank call" and "desire to 'hire a hitman' to kill a fictitious target," but still determined Plaintiff was a danger to others and thus committed him. (Am. Compl. ¶ 130.) Plaintiff contends that such action occurred because of Defendants' "prejudicial and baseless judgments" because of Plaintiff's disability. (*Id.*) According to Plaintiff, "Defendants seemingly ignored the fact that 'prank calls' to suicide hotlines were hardly an unheard of phenomenon, and that it wouldn't be beyond the pale of possibility for an otherwise 'sane' person to call a suicide hotline . . . ." (*Id.*) Plaintiff contends that Singh "consistently relied upon prejudicial and stereotypical assumptions about the Plaintiff"

and failed to independently arrive at the conclusion that Plaintiff suffered from a mental illness. (*Id.* ¶ 131.)

Similar to the allegations against Rutgers, Fitzpatrick, and Richardson, Plaintiff's Complaint fails to state an ADA or RA claim against the remaining Defendants. Plaintiff's conclusory allegations fail to demonstrate any facts that discriminatory animus based on Plaintiff's disability caused Defendants to commit Plaintiff. As such, Plaintiff fails to allege the "required causal connection" and thus fails to state a claim. *See Heine*, 2016 WL 7042069, at *10. Therefore, the Court dismisses Plaintiff's Counts Two and Three.

### C. COUNTS FIVE THROUGH NINE

In Counts Five through Nine, Plaintiff asserts state law claims of simple assault, battery, false imprisonment, IIED, and NIED. Because Plaintiff does not allege diversity jurisdiction and the Court dismisses Plaintiff's federal claims, the Court could only exercise supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367. Having dismissed Plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Pursuant to 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3). For a district court to exercise supplemental jurisdiction, the court "requires, at a minimum, a federal claim of sufficient substance to confer subject matter jurisdiction on the court." *City of Pittsburgh Comm'n. on Hum. Rels. v. Key Bank USA*, 163 F. App'x 163, 166 (3d Cir. 2006) (quoting *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195 (3d Cir.1976)); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial

economy, convenience, and fairness to the parties provide an affirmative justification for doing so." (emphasis in original) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995)).

The Third Circuit has explained that "if it appears that all federal claims are subject to dismissal, the court should not exercise jurisdiction over remaining claims unless 'extraordinary circumstances' exist." *Key Bank USA*, 163 F. App'x at 166 (quoting *Tully*, 540 F.2d at 195); *see Robert W. Mauthe, M.D., P.C. v. Optum Inc.*, 925 F.3d 129, 135 (3d Cir. 2019) ("[A] court does not err if it declines to exercise supplemental jurisdiction over state claims after it dismisses a federal claim on which its jurisdiction is based in the absence of extraordinary circumstances."). "[S]ubstantial time devoted to the case" and "expense incurred by the parties" do not qualify as extraordinary circumstances. *See Tully*, 540 F.2d at 195; *Rivera v. United States*, No. 21-3131, 2023 WL 8108642, at *5 (D.N.J. Jan. 17, 2023), *aff'd sub nom.*, No. 23-1286, 2023 WL 8058753 (3d Cir. Nov. 21, 2023) ("[T]ime already invested in litigating the state cause of action is an insufficient reason to sustain the exercise of pendent jurisdiction.") (quoting *Lovell Mfg. v. Exp.-Imp. Bank of the U.S.*, 843 F.2d 725, 735 (3d Cir. 1988)).

Taking into consideration judicial economy, convenience, and fairness, no exceptional circumstances are present such that the Court should retain supplemental jurisdiction. Plaintiff may continue to assert the state law claims in Plaintiff's preferred jurisdiction before a court apt to interpret its own state law. Moreover, the case remains at the motion to dismiss stage, and it does not appear that any discovery has occurred. As such, the Court denies Defendants' Motions to Dismiss counts five through nine against Defendants without prejudice as moot.

As Plaintiff originally filed this case in state court, the Court will remand what remains of this action to state court rather than dismissing it without prejudice. *See Borough of West Mifflin*,

45 F.3d at 788 ("[W]e believe that in a case that has been removed from a state court, a remand to that court is a viable alternative to a dismissal without prejudice."); *see also Alston v. Verizon Delaware LLC*, 746 F. App'x 154, 155 (3d Cir. 2019) (affirming district court's discretionary decision to decline supplemental jurisdiction and remanding case to state court); *Williams v. Cnty. of Union*, No. 17-6672, 2019 WL 102407, at *4 (D.N.J. Jan. 3, 2019) (dismissing Section 1983 claims without prejudice and remanding matter to state court).[19] The Court takes no view as to the merits or viability of Plaintiff's state law claims, only that it lacks subject-matter jurisdiction to preside over them and declines to exercise supplemental jurisdiction.

---

[19] Certain Defendants contend that Plaintiff failed to properly utilize fictitious pleading in prior Complaints to preserve claims against previously unnamed Defendants. (*See e.g.*, ECF No. 108-3 at 10–12; ECF No. 172-2 at 11–12.) As the Court dismisses the underlying federal claims and exercises its discretion not to retain jurisdiction on the state law claims, the Court need not address this argument.

The Court also notes that Plaintiff's Complaints name additional defendants who have not been served and thus did not move to dismiss. In accordance with 28 U.S.C. § 1915(e)(2), "[T]he court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted." Therefore, while not all Defendants moved to dismiss, the Court dismisses claims against all Defendants "pursuant to 28 U.S.C. § 1915(e)(2) for Plaintiff's failure to state a claim . . . for which relief may be granted." *Mason v. City of Philadelphia*, No. 13-5163, 2014 WL 4473724, at *7 n.16 (E.D. Pa. Sept. 10, 2014).

Finally, as the underlying Complaints have been dismissed, the Court dismisses any cross claims by Defendants without prejudice as moot. *See Rakowski v. City of Brigantine*, No. 19-21847, 2022 WL 326992, at *1 n.1 (D.N.J. Feb. 3, 2022) (dismissing crossclaims as moot following dismissal of underlying complaint).

IV.     **CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss are **GRANTED in part** and **DENIED in part as moot**. Plaintiffs' claims are **DISMISSED** without prejudice.[20] The matter will be remanded to the Superior Court of New Jersey. An appropriate Order will accompany this Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: June 12, 2024

---

[20] The Court will dismiss Counts One, Two, Three, and Four against Rutgers with prejudice. The Court need not dismiss without prejudice and with leave to amend if amendment would be "inequitable or futile." *See also Columbus LTACH Mgmt., LLC v. Quantum LTACH Holdings, LLC*, No. 16-6510, 2019 WL 2281632, at *4 (D.N.J. May 29, 2019) (dismissing with prejudice because plaintiff had repeatedly failed to correct the same deficiency in his pleading); *Mesadieu v. City of Linden*, No. 18-14561, 2019 WL 2514715, at *5 (D.N.J. June 18, 2019), *aff'd*, 791 F. App'x 294 (3d Cir. 2020) (dismissing with prejudice and finding any "further amendment would be futile" where the Court previously "set forth the deficiencies with Plaintiff's claims and Plaintiff failed to cure any of those deficiencies in the FAC."); *Prince v. Trumark Fin. Credit Union*, No. 22-3097, 2022 WL 10584444, at *5 (E.D. Pa. Oct. 18, 2022), *appeal dismissed*, No. 22-3173, 2023 WL 3529406 (3d Cir. Mar. 2, 2023) (dismissing "claim with prejudice as [Plaintiff] has now twice failed to plead" his claims). Here, Plaintiff's claims against Rutgers have now been dismissed three times, and allowing Plaintiff a fourth bite at the apple against Rutgers would only serve to needlessly extend this litigation, and subject Rutgers to additional cost in added time, attention and financial expense. As such, the Court finds that any amendment would be futile.